UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| KAREN S. HEAVIN, ) | |
| ) | |
| Plaintiff, ) | Civil No. 3:19-cv-00045-GFVT-EBA |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| LUCIAN YATES III, ) | **&** |
| ) | **ORDER** |
| Defendant. ) | |
| ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court upon cross-motions for summary judgment filed by Plaintiff Karen S. Heavin, a former nontenured professor at Kentucky State University, and Defendant Lucian Yates III, interim provost and vice president for academic affairs at KSU. [R. 31; R. 32.] Dr. Heavin claims that Dr. Yates' termination of her employment with KSU violated her due process rights under 42 U.S.C. § 1983, and Dr. Heavin is seeking damages against Dr. Yates. [R. 1.] Dr. Heavin argues that summary judgment is appropriate because she was not removed from her employment at KSU for cause, every reasonable official would have understood that Dr. Yates' removal of Dr. Heavin violated her employment rights, and Dr. Heavin suffered damages because of the termination. [R. 32.] Conversely, Dr. Yates argues that summary judgment is appropriate because Dr. Yates is entitled to qualified immunity, and even if not, Dr. Heavin was not deprived of any constitutionally required process. Because Defendant Lucian Yates is entitled to qualified immunity, his Motion for Summary Judgment will be GRANTED and Plaintiff Karen Heavin's Motion for Summary Judgment will be DENIED.

**I**

Kentucky State University hired Dr. Heavin as a Visiting Instructor of Mathematics in 2007. [R. 31-1.] Originally, Dr. Heavin's instructor position at KSU was non-tenure track. *Id.* However, on July 3, 2014, Dr. Heavin accepted the appointment of Assistant Professor of Mathematics at KSU, which was a tenure track position.[1] [R. 31-2.] After the initial tenure-track appointment, Dr. Heavin remained employed at KSU with one-year renewed contracts through the 2018–2019 academic year. [R. 32-1.] While at KSU, Dr. Heavin also served as the dual credit program developer and coordinator from 2012–2019 and as the Math Education Coordinator from 2015–2019. [R. 1 at 2.]

Dr. Heavin's last contract with KSU began on August 13, 2018, and was scheduled to end on May 13, 2019. [R. 32-1.] During the 2018–2019 academic year, Dr. Heavin had disagreements with multiple university administrators that included submitting grades late, refusing to complete learning outcome paperwork requested by Education Department Chair Kevin Jones, and declining to meet with Dr. Yates on the day he requested to meet. [R 31-5 at 2–7; R. 31-6 at 9; R. 31-7 at 3.] Dr. Heavin characterizes these disagreements as "petty complaints." [R. 34 at 2.] Dr. Yates, on the other hand, alleges that Dr. Heavin's tardiness in turning in her grades prevented KSU's IT department from making needed system-wide repairs in a timely manner and that refusing to submit the requested paperwork and to meet with Dr. Yates was "unacceptable."[2] [R. 31 at 2–3.] On February 13, 2019, Dr. Yates called a meeting

---

[1] A stipulation of Dr. Heavin's appointment was that she would complete her Ph.D. prior to December 2016 or the position would be terminated. [R. 31-2.] Although the parties dispute the relevance of the Ph.D. requirement to this litigation, the Court finds that the provision is irrelevant to this inquiry for two reasons: (1) Dr. Heavin's lack of a Ph.D. was never mentioned as a reason for her termination from KSU, and (2) her annual contract with KSU was renewed through the 2018–2019 academic year despite KSU and Dr. Yates' knowledge that Dr. Heavin did not have her Ph.D. and did not receive it until August 2020.

[2] On February 1, 2019, when Education Department Chair Kevin Jones requested that Dr. Heavin submit learning outcome paperwork for accreditation purposes, Dr. Heavin responded by email: "Sooo… I am going to say no to completing the form . . . I am a bit tired of being treated like functional furniture at this university so… maybe one

with Dr. Heavin, Ms. Candace Raglin (Director of Human Resources at KSU), and Dr. Abdul Turay (Dean of the College of Business and Computational Sciences at KSU).  [R. 32-5 at 44.]  During the meeting, Dr. Heavin was informed that her appointment at KSU was not being renewed.[3]  [R. 1 at 2.]  Dr. Heavin also received a letter stating that she was "without any duties and responsibilities at Kentucky State University" but would continue to receive her current base salary of $47,320 until November 11, which was 270 days from the date the letter was postmarked.  [R. 32-4.]  Dr. Heavin was then "asked for her laptop and her keys and her badge," taken to her office to pack up her things, and escorted to her car.  [R. 32-5; R. 32-7.]

On February 25, Dr. Heavin submitted a grievance regarding her termination to the university.  [R. 1 at 3.]  The university investigated Dr. Heavin's grievance and issued a report finding that "there is insufficient evidence to support a finding that [Dr. Yates] violated Kentucky Labor Law or Faculty Handbook."[4]  [R. 34-8 at 11.]  On May 3, Dr. Heavin asked KSU President Christopher Brown III to assemble a grievance panel pursuant to the Faculty Member Handbook, but no panel was assembled.[5]  On May 13, 2019, KSU Vice President Douglas Allen reviewed and affirmed the university's report in a letter that was sent to Dr.

---

of the 6 figure Deans and VP's can complete the paperwork – although I doubt they would even know where to begin!"

[3] The parties disagree about the proper characterization of Dr. Heavin's departure from KSU.  Dr. Yates states that he "decided not to renew Dr. Heavin's contract for another term" [R. 31 at 3] while Dr. Heavin states that she was "remove[d]" from "her employment at KSU at a meeting." [R. 32 at 5.]  The nature and legal significance of Dr. Heavin's departure from KSU will be discussed in greater detail below.

[4] The task of investigating Dr. Heavin's grievance was delegated to university attorney and investigator Hannah Hale.  [R. 34-8 at 1.]  In creating the report, Ms. Hale interviewed Dr. Heavin and two witnesses.  Id. at 2-3.  She attempted to interview Dr. Yates but received no response.  Id. at 3.  Typically, a grievance of this nature would be handled or delegated by the provost, which in this case is Dr. Yates.  Dr. Yates states he did not respond to Ms. Hale because the grievance was at least in part against him and President Brown wanted Dr. Yates to make sure that he did not involve himself in Dr. Heavin's grievance proceedings. [R. 35 at 14.]  Ms. Hale also gathered and reviewed all relevant documents related to Dr. Heavin's allegation, including Dr. Heavin's grievance letter, Dr. Heavin's last appointment letter, email documentation provided by Dr. Heavin, Dr. Heavin's notice of non-reappointment, and all applicable university statements and guidelines.  Id.

[5] Dr. Yates states that a panel was not assembled because no official decision had yet been rendered as to Dr. Heavin's grievance when Dr. Heavin requested a panel be convened.  [R. 31 at 5.]

Heavin.  [R. 31-15.]

On June 25, Dr. Heavin filed this lawsuit.  [R. 1.]  In her complaint, Dr. Heavin initially sued both Kentucky State University and Dr. Yates.  *Id.*  On July 30, KSU and Dr. Yates filed a motion to dismiss for failure to state a claim, which was affirmed as to KSU and denied as to Dr. Yates on November 7.  [R. 8 at 9.]  The Court found that KSU was immune from suit on Eleventh Amendment grounds and dismissed the claims against KSU for lack of subject matter jurisdiction.  [R. 8 at 6.]  As for Dr. Yates, the Court found that a determination of whether Dr. Yates was entitled to qualified immunity could more appropriately be considered after discovery.  *Id.* at 9.  The parties filed cross-motions for summary judgment on October 19, 2020, and the motions are now ripe for review.  The Court has closely scrutinized both the facts and the briefs and concludes that a hearing is not necessary to properly adjudicate these cross-motions for summary judgment.

**II**

**A**

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The moving party bears the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact.

4

*Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court then must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). In making this determination, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

The standards used to evaluate summary judgment motions do not change when parties file cross-motions for summary judgment. *See Craig v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 387 (6th Cir. 2016).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**B**

The Court now turns to Dr. Heavin's § 1983 claim against Dr. Yates and first addresses whether Dr. Yates is entitled to qualified immunity. It is unclear from Dr. Heavin's Complaint whether this claim is against Dr. Yates in his official or individual capacity. [R. 1 at 8.] To the

extent Dr. Heavin seeks to impose liability against Dr. Yates in his official capacity, he is immune from suit for monetary damages, as the liability imposed, in reality, is on the entity he represents, not the individual. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985); *Hutsell v. Sayre*, 5 F.3d 996, 1002 (6th Cir. 1993). However, even if the Court construes Dr. Heavin's § 1983 claim as being against Dr. Yates in his individual capacity, he is entitled to qualified immunity and the claim still fails.

a

Qualified immunity is a doctrine that shields government officials, including public university administrators, who perform discretionary functions from civil liability "unless their conduct violates clearly established rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (citing *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011)); *see also Corbett v. Garland*, 228 F. App'x 525, 529 (6th Cir. 2007) (finding qualified-immunity defense applied to university president and reversing district court's order granting plaintiff's motion for summary judgment). The question of whether qualified immunity attaches to an official's actions "is a purely legal question for the trial judge to determine prior to trial." *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Either prong may be addressed first, depending on the circumstances of the case before the court, and both prongs must be satisfied for the plaintiff to demonstrate that the defendant is not entitled to qualified immunity. *See Pearson*, 555 U.S. at 236; *see also Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) ("A plaintiff must satisfy both inquiries in order to defeat the assertion

6

of qualified immunity.") (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)).

The term "clearly established" means that the law was, at the time of the individual's conduct, "'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful" and the law placed the constitutionality of the conduct "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).  A legal principle must also have a "sufficiently clear foundation in then-existing precedent" and be "settled law" to be clearly established.[6]  *Id.*  Once qualified immunity has been invoked, the plaintiff bears the burden of showing that qualified immunity is not appropriate. *Quigley*, 707 F.3d at 681 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

**b**

The first prong of the qualified immunity analysis requires a determination of whether, taken in the light most favorable to the party asserting injury, the facts alleged show Dr. Yates' conduct violated a constitutional right. *See Garvie*, 845 F.2d at 649.  Dr. Heavin argues that she had a property interest in her tenure-track position at KSU, that she was unlawfully removed from her position by Dr. Yates at the meeting on February 13, 2019, and that she suffered harm because of the removal.  *Id.* at 6–7.  Dr. Heavin specifically claims that her removal was not for cause, as required by Kentucky law, and that Dr. Yates' attempt to describe her removal as a non-reappointment likewise fails because Dr. Yates did not follow the proper university procedures for non-reappointment, and Dr. Heavin did not receive adequate notice before the

---

[6] Dr. Heavin points to, and both sides discuss, *Frost v. University of Louisville*, 392 F. Supp. 3d 793 (W.D. Ky. 2019), which is a due process case involving allegations of sexual misconduct by a professor at the University of Louisville. [R. 31 at 11; R. 34 at 5.]  However, any principles established in *Frost* do not establish precedent in this case for three reasons: (1) *Frost* is a district court case and is therefore not binding on this court, (2) *Frost* involved the termination of a professor after allegations of sexual misconduct, which involves a different factual predicate from what is before the Court here, and (3) *Frost* was decided after Dr. Heavin filed her lawsuit.  The Court therefore declines to analyze and apply *Frost* to this case.  *See Wesby*, 138 S. Ct. at 589.

7

February meeting in which she was removed. *Id.* at 2, 6.

It is well settled that "[s]tate employees who have a property interest in their employment are entitled to certain minimum process before being fired." *Cox v. Shelby State Community College*, 48 F. App'x 500, 507 (6th Cir. 2012) (citing *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532 (1985)). A "property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (citations omitted).

The Supreme Court has held that "college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process." *Bd. Of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972) (citing *Wieman v. Updegraff*, 344 U.S. 183 (1952)). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. 532 at 542 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). In the employment context, "the Supreme Court has explained that 'the root requirement of the Due Process [C]lause' is 'that an individual be given the opportunity for a hearing *before* he is deprived of any significant property interest.'" *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting *Loudermill*, 470 U.S. at 541).

However, due process rights are not without limits. A "university may dismiss a nontenured professor for any reason, or no reason, and the professor has no recourse unless such dismissal abridges his exercise of a constitutionally protected right." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (citing *Perry v. Sinderman*, 408 U.S. 593, 592 (1972)). Because of this, federal courts are reticent to "interfere in the internal operations of the academy." *Id.* (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). No constitutional right to teach a specific class

8

or at a particular university exists, *id.* at 832, and a university's failure to follow its own internal procedures does not give rise to a constitutionally protected property interest. *See Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (stating that "a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation"); *see also Doe v. Cummins*, 662 F. App'x 437, 445 n.2 (6th Cir. 2016) (noting that the Constitution and "not internal school rules or policies" mandate what due process is constitutionally required following an alleged deprivation of a property interest).

Here, the parties do not dispute that in early February 2019, Dr. Heavin was a nontenured faculty member at KSU who was completing a one-year contract that was set to expire on May 13. [R. 31 at 2; R. 32 at 2.] Further, the contract specifically stated that Dr. Heavin's employment was subject to "compliance with the terms and conditions of the statutes and regulations of the Commonwealth of Kentucky, Kentucky State University (KSU) Board Policies, [and] the Kentucky State University Faculty Handbook." [R. 32-1.]

However, the parties vigorously dispute the characterization of the outcome of the February 13, meeting between Dr. Heavin and Dr. Yates and the applicable laws and regulations. Dr. Heavin states that she was terminated on that date with no advance notice, and that the payments she received until November 2019 should be "characterized as partial compensation for damages arising from KSU's breach of [Dr.] Heavin's contract." [R. 32 at 4–5; R. 34 at 3.] Dr. Heavin alleges a violation of KRS § 164.360(3), arguing that because her removal on February 13, was not for cause, her due process rights were violated. [R. 32.] Under Kentucky statute, state university faculty members shall not be removed "except for incompetency, neglect of or refusal to perform his duty, or for immoral conduct." KRS § 164.360(3). The statute also states that a faculty member will not be removed until after they have received ten days' written

9

notice providing the nature of the charges, and they have been given an opportunity to make a defense before the university's governing board. *Id.* Dr. Heavin also argues that Dr. Yates did not follow the KSU Faculty Handbook, which states that a non-tenured faculty member with three or more years of service to the university "shall be notified of intended termination prior to the beginning date of the last contract which in no event shall be less than the two hundred seventy (270) calendar days." [R. 32-2.]

Dr. Yates, on the other hand, argues that on February 13, he informed Dr. Heavin that her contract "would not be renewed for the 2019-2020 academic year" and provided notice in the form of a hand-delivered letter that extended Dr. Heavin's contract from May 13, 2019, to November 11, 2019, in order to comply with the Faculty Handbook's 270-day notice requirement. [R. 31 at 4.] Dr. Yates also contends that KRS § 164.360(3) is not applicable here because he did not terminate her at the February meeting, but instead notified her that her contract would not be renewed the following academic year. *Id.*

The facts and record in this case demonstrate that the February meeting between Dr. Heavin and Dr. Yates involved notification of a future non-renewal of Dr. Heavin's contract, not removal. Therefore KRS § 164.360(3), which governs removal, is not applicable. At the meeting on February 13, Dr. Heavin received notice that her contract was not being renewed for the following academic year. Although Dr. Heavin was relieved of her teaching responsibilities at the meeting, she continued to receive her full pay and benefits, and therefore her employment with KSU was not terminated until November 11, approximately nine months after she received notice of the non-renewal of her contract. [R. 31-8 at 61.] It is not clear whether the manner in which Dr. Yates informed Dr. Heavin of her simultaneous contract extension and eventual non-renewal fully complied with the Handbook requirement that non-tenured faculty members with

10

more than three years of service at KSU "be notified of intended termination prior to the beginning date of the last contract." [R. 32-2.] However, while Dr. Heavin may reasonably argue that Dr. Yates did not follow KSU's internal procedures for non-renewal to the letter, failing to strictly adhere to internal policies "does not give rise to a procedural-due-process violation." *See Doe v. Miami Univ.*, 882 F.3d at 603.

Furthermore, during the 270-day period between receiving the notice of non-renewal and termination, Dr. Heavin availed herself of KSU's grievance procedures. Approximately two weeks after meeting with Dr. Yates, Dr. Heavin submitted a grievance to the university regarding the meeting with Dr. Yates and the surrounding circumstances. [R. 1 at 3.] The KSU grievance procedures provided Dr. Heavin with the opportunity to be interviewed and share her side of the story and have the matter more fully investigated. As discussed above, the investigator conducted a thorough investigation and concluded that Dr. Yates had not violated any Kentucky Labor Law or the Faculty Handbook. [R. 34-8 at 11.] There is no evidence that Dr. Yates denied or impeded Dr. Heavin from availing herself of KSU's grievance procedures. Furthermore, Executive Vice President Douglas Allen reviewed the investigation report and information provided by Dr. Heavin and issued a written decision finding that no violation had occurred. [R. 31-15.]

### III

Ultimately, taken in the light most favorable to the party asserting injury, Dr. Heavin was provided with notice and the opportunity to be heard before she was removed from her tenure-track position at KSU, and therefore no constitutional violation occurred. *Loudermill*, 470 U.S. 532 at 542. It is therefore unnecessary to proceed past the first step of the qualified immunity analysis. *See Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (discussing that a

11

plaintiff must satisfy both prongs of the qualified immunity analysis to defeat an assertion of qualified immunity) (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)).  The Court therefore finds that Dr. Yates is entitled to qualified immunity as to Dr. Heavin's § 1983 claim against him in his individual capacity.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Lucian Yates' Motion for Summary Judgment **[R. 31]** is **GRANTED**; and
2. Plaintiff Karen S. Heavin's Motion for Summary Judgment **[R. 32]** is **DENIED**.

This the 2nd day of February, 2021.

Gregory F. Van Tatenhove
United States District Judge